IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CAPITAL CENTRE, LLC,

Plaintiff,

-against-

DANIEL R. WILKINSON, SR.,

Defendant.

04-CV-0182 RDB

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTFF'S MOTION FOR SUMMARY JUDGMENT AND/OR
TO DISMISS FOR FAILURE TO STATE A CLAIM AND IN
SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.........................................4-5

STATEMENT OF FACTS ..........................................6-13

ARGUMENT ......................................................14

**Point I:**

Standard for Summary Judgment ...............................14

    A. Cap Centre Motion for Summary Judgment for
       Breach of Its Contract Claim Should be Denied .......14-16

    B. Cap Centre Motion for Summary Judgment on
       Wilkinson's Negligent Misrepresentation
       Claim Should be Denied ............................16-20

       1. Wilkinson has Made a Claim for
          Negligent Misrepresentation ....................16-18

       2. Cap Centre Alleges it Owed No Duty to
          Wilkinson .........................................19

       3. Cap Centre Alleges Wilkinson has No Standing .....19-20

    C. Wilkinson is Entitled to a Jury Trial ..............20-22

    D. Other Issues Raised by Cap Centre .....................22

**Point II:**

    E. Wilkinson is Entitled to Summary Judgment
       on Plaintiff's Breach of Contract Claim ...............22

    F. Wilkinson is Entitled to Summary Judgment
       on Plaintiff's Negligent Misrepresentation Claim ....23-34

CONCLUSION ...................................................34

**TABLE OF AUTHORITIES**

**CASES**

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ................14

Bland v. Norfolk & Southern R.R. Co., 406 F.2d 863
(4th Cir. 1969) ...........................................14

Silver Hill Station LP, 158 F. Supp. 2d at 631
..................................................14, 23, 24, 25

Trevino v. Yamaha Motor Corp., 882 F.2d 182
(5th Cir. 1982) ...........................................14

Carson v. Giant Food, Inc. 187 F. Supp. 2d (Md. 2002) ........15

Copies Typewriters Calculators, Inc. v. Toshiba Corp.,
576 F. Supp. 312 (D.Md. 1983) ...............................15

Hulsey v. West, 966 F.2d 579 (10th Cir. 1992) ................21

Allstate Ins. Co. v. Reliance Ins. Co., 786 A.2d 27
(Md.App. 2001) ..............................................22

Bean v. Steuart Petroleum Co., 224 A.2d 295 (Md. 1966) .......22

Carson v. Giant Food, Inc. 187 F. Supp. 2d 462
(Md. 2002) ..................................................22

Copies Typewriters Calculators, Inc. v. Toshiba Corp.,
576 F. Supp. 312 (D.Md. 1983) ...............................22

Parker v. Columbia Bank, 91 Md. App. 346, 604 A.2d 521
(Md. 1992) .....................................23, 24, 27, 31

Jones v. Hyatt Ins. Agency, Inc., 741 A.2d 1099 (Md.
1999) .......................................................23

Mesmer v. M.A.I.F., 725 A.2d 1053 (Md. 1999) .................23

G&M Oil Co. v. Glenfeld Fin. Corp., 782 F. Supp. 1078
(D.Md. 1989) .............................................24, 26

Weisman v. Connors, 312 Md. 428, 540 A.2d 783 (Md. 1988) ......27

**STATUTES AND RULES**

Federal Rules of Civil Procedure 56(c) ......................14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CAPITAL CENTRE, LLC,

                    Plaintiff,

    -against-

DANIEL R. WILKINSON, SR.,

                    Defendant.

04-CV-0182 RDB

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTFF'S MOTION FOR SUMMARY JUDGMENT AND/OR TO DISMISS FOR FAILURE TO STATE A CLAIM AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Defendant and counter-plaintiff Daniel R. Wilkinson, Sr. ("Wilkinson") respectfully submits this memorandum of law in opposition to plaintiff and counter-defendant Capital Centre LLC's ("Cap Centre") motion for summary judgment and/or to dismiss for failure to state a claim. In addition, Wilkinson submits this memorandum in support of his cross-motion for summary judgment.

Cap Centre filed a two-count complaint against Wilkinson alleging breach of contract and negligent misrepresentation. In a circuitous manner, Cap Centre has moved for summary judgment only as to the breach of contract claim.[1] Although it acknowledges Wilkinson did not sign the

---

[1] On or about April 14, 2005, Cap Centre filed a summary judgment motion solely as to its breach of contract count. In that motion, Cap Centre did not seek summary judgment on Wilkinson's counterclaim for negligent misrepresentation. On July 1, 2005, Cap Centre filed another motion for summary judgment raising a host of issues, including moving for

lease or guaranty in his individual capacity, Cap Centre contends Wilkinson nonetheless is personally liable for economic damages because he executed the guaranty on behalf of an alleged non-existent principal.  Cap Centre's argument is specious and conclusory.  To maintain a breach of contract claim against Wilkinson, individually, Cap Centre must first prevail on its negligent misrepresentation claim because Wilkinson in his individual capacity signed neither the lease nor guaranty.  Given that it has not even sought summary judgment on its negligent misrepresentation claim, Cap Centre, as a matter of law, is not entitled to judgment for breach of contract against Wilkinson, individually.

Wilkinson cross-moves for summary judgment on both counts of Cap Centre's complaint.  Cap Centre's breach of contract claim fails because Wilkinson is neither a party nor a signatory to either the lease or guaranty.  Likewise, the negligent misrepresentation claim fails because Wilkinson owed no tort or fiduciary duty to Cap Centre, given no special relationship or intimate nexus existed between the parties.  Accordingly, Wilkinson is entitled to judgment as a matter of law as to each of the claims pled by Cap Centre.

---

summary judgment on Wilkinson's counterclaim.  Wilkinson's memorandum will address only the issues raised in Cap Centre's July 1 motion.

## STATEMENT OF FACTS

Wilkinson is a professional football player, who was a defensive tackle for the Washington Redskins for five seasons from September 1997 to July 2003. See Affidavit of Christopher S. Randolph sworn to on July 18, 2005 ("Randolph Aff."), Exh. **A** (Deposition of Daniel Wilkinson sworn to on January 13, 2005 ("Wilkinson Dep.")) at 8-9. Wilkinson has played for the Detroit Lions from September 2003 to the present. Wilkinson Dep. at 10.

In early 2003, Wilkinson negotiated with Starwood Hotels & Resorts Worldwide, Inc. about constructing and operating a "W" hotel in Washington, D.C. Wilkinson Dep. at 66-67.

About the same time, Wilkinson contacted David Cordish about constructing and operating a hotel at the Boulevard at the Capital Centre ("Capital Centre") in Landover, Maryland. Wilkinson Dep. at 64-70. Wilkinson retained Sandra Long ("Long") to negotiate lease of land where the hotel would be constructed in Landover, Maryland. Wilkinson Dep. at 49-53. Wilkinson and Long met with David Cordish, Reed Cordish and Michael Morris ("Morris") on a couple of occasions about the hotel. Wilkinson Dep. at 64-65. Morris became point person for Cap Centre, speaking with Wilkinson several times in March 2003. See Randolph Aff.,

Exh. **B** (Deposition of Michael Morris sworn to on January 18, 2005 ("Morris Dep.")) at 60-62; Wilkinson Dep. at 96.

While Wilkinson was discussing the hotel, Cap Centre's officials were more interested in persuading a Redskins player to operate a restaurant/sports bar at the Capital Centre.  In an e-mail dated March 20, 2003 addressed to several Cordish officials, Reed Cordish stated,

> We have a limited amount of space left on the main street, however, it is prime space.  What unique uses that would make the project special or be good customer generators.  My thoughts:
>
> *              *              *              *
>
> Great sports bar
> Celebrity related restaurant or bar

See also Morris Dep. at 67-68.

In response, Blake Cordish asked, "Anyone have a theory on how to get to one of Redskins players?"  Reed Cordish replied, "We are already broaching idea with Dan 'Big Daddy' Wilkinson."  See Randolph Aff., Exh. **C** (e-mail dated March 20, 2003).

In early April 2003, Morris met with Starwood and Red Rock Global officials concerning a hotel at the Capital Centre.  See Randolph Aff., Exh. **D** (note from Starwood to Morris dated April 7, 2003).  Around the time of that meeting, Morris suggested that Wilkinson team with Red Rock on the hotel.  Morris Dep. at 38-39.  Wilkinson Dep. at 109-110.

Days later, Morris sent Long a proposed Letter of Intent ("Hotel LOI") concerning the hotel at the Capital Centre.  Randolph Aff., Exh. **E** (e-mails between Morris and Long dated April 8 and 15, 2003).  See also Randolph Aff., Exh. **F** (draft Hotel LOI dated April 15, 2003).  The name of the guarantor was blank.  Section 2 of the draft Hotel LOI provided "Guarantor: _____ will guaranty Tenant opening for business, full lease obligations for the entire Term of the Lease (and any option period exercised by Tenant)(please provide financials of guarantor for review)".  Id.  Section 2 reflects the customary template used by Cap Centre, which was prepared by Morris.  Morris Dep. at 84-85.

Wilkinson was willing to personally guarantee the financial obligations incurred in connection with the hotel at the Capital Centre but before providing his personal financial information, Wilkinson insisted on a confidential agreement.  Long had counsel prepare a proposed agreement which was forward to Morris.  See Randolph Aff., Exh. **G** (e-mail from Long to Morris dated April 21, 2003).  Wilkinson produced his financial statement to Morris in connection with the hotel project.  Wilkinson Dep. at 81, 84-88.

On or about April 22, 2003, Morris sent Wilkinson a revised Hotel LOI identifying Wilkinson and his wife as guarantors.  See Randolph Aff., Exh. **H** (draft Hotel LOI dated April 22, 2003).  Section 2 stated, "Guarantor: Daniel R.

-8-

Wilkinson (and wife, if applicable) will guaranty Tenant opening for business, full lease obligations for the entire Term of the Lease (and any option period exercised by Tenant)." Id. Section 17 provided,

> Security Deposit: Tenant shall deposit the equivalent of three (3) months of total rental obligations (the "Deposit"). At any point during the Term of Lease (or any options thereafter) should the net worth of Daniel R. Wilkinson ("Guarantor") fall below $6,000,000 security deposit shall increase to six (6) months of total rental obligations (the "Increased Deposit"). The Deposit shall be returned to Tenant at the Termination of the Lease assuming there is no event of default by Tenant.

Id. Wilkinson asked Morris to remove the reference to his wife because they were going through a divorce. Wilkinson Dep. at 93-95.

Morris did not remove reference to Wilkinson's wife as requested and did not make any further modifications to the Hotel LOI. Morris Dep. at 63-64. The Hotel LOI was not signed. Rather, Morris shifted the focus from a hotel to a restaurant/sports bar. Wilkinson Dep. at 202-208. On April 28, 2003, Morris sent Long a proposed Letter of Intent ("Restaurant LOI") concerning "sports bar/tarverne." See Randolph Aff., Exh. **I** (e-mail from Morris to Long dated April 28, 2003, including Restaurant LOI). Wilkinson Dep. at 203-208.

In preparing the Restaurant LOI, Morris did not request any additional information from Wilkinson; instead Morris simply transferred language concerning the guarantor and security deposit from the Hotel LOI into the Restaurant LOI. Morris Dep. at 98. Section 2 of the Restaurant LOI stated, "Guarantor: Daniel R. Wilkinson (and wife, if applicable) will guaranty Tenant opening for business, full lease obligations for the entire Term of the Lease (and any option period exercised by Tenant)(please provide financials of guarantor for review)." Id. Section 17 of the Restaurant LOI stated,

> Security Deposit: Tenant shall deposit the equivalent of three (3) months of total rental obligations (the "Deposit"). At any point during the Term of Lease (or any options thereafter) should the net worth of Daniel R. Wilkinson ("Guarantor") fall below $6,000,000 security deposit shall increase to six (6) months of total rental obligations (the "Increased Deposit"). The Deposit shall be returned to Tenant at the Termination of the Lease assuming there is no event of default by Tenant.

Id.

> In a May 13, 2003 e-mail to Long, Morris stated,

> We never finished our discussion regarding the sports bar. I thought you still had some points to discuss. It is important that we keep this deal on track. Believe it or not, the sports bar is a higher priority for Cordish than the hotel.

-10-

See Randolph Aff., Exh. **J** (e-mails between Morris and Long dated May 13, 2003).   In response, Long stated, "We need to move on both projects.   Dan's 1st priority is the hotel, the sports bar is a close second."   Id.   See also Wilkinson Dep. at 108.

On May 15, 2003, Morris revised the Restaurant LOI substituting **"Dandar Enterprises"** as guarantor.[2] *(emphasis added).*   Section 2 stated, "Guarantor: Dandar Enterprises will guaranty Tenant opening for business, full lease obligations for the entire Term of the Lease (and any option period exercised by Tenant)."   See Randolph Aff., Exh. **K** (draft Restaurant LOI dated May 15, 2003).

Morris prepared a draft lease for the restaurant and presented it to Wilkinson.   Morris Dep. at 110-111; Wilkinson Dep. at 92.   The proposed lease incorrectly identified Dandar as a limited liability corporation, instead of a for profit company.   See Randolph Aff., Exh. **L** (draft lease on restaurant).   The lease went through several iterations with the same misnomer.   Morris Dep. at 111.

Wilkinson refused to personally guarantee the restaurant lease, telling Morris Dandar Enterprises, Inc.

---

[2]      Dandar Enterprises Inc. ("Dandar") is an Ohio company, incorporated in March 1997.  Dandar is the "overseer, the parent company, if you will, of the other Dandar Enterprises companies".  Wilkinson Dep. at 16-17.  Wilkinson has several entities with Dandar in the name – Dandar Enterprises Inc., Dandar Enterprises of Ohio, LLC, and Dandar Enterprises of Maryland LLC.  Wilkinson Dep. at 11-29.  The genesis of Dandar's name "is the first three initials of [Wilkinson] name and the first three initials [Daniel] of my brother's name [Darryl].".  Id. at 13, 20.

would be the guarantor. Wilkinson Dep. at 99-104, 113-115. Wilkinson has not personally guaranteed a commercial lease before and he believed it did not make sense for him to guarantee the lease personally in this instance. Id. at 100-101.

On May 29, 2003, Wilkinson's counsel incorporated A Big Daddy Joint LLC ("ABDJ") to be tenant on the lease. See Randolph Aff., Exh. **M** (Articles of Organization for A Big Daddy Joint LLC). On or about June 9, 2003, Wilkinson signed the lease as authorized agent of ABDJ, and signed the guaranty as Dandar's agent. Wilkinson Dep. at 148-152. See also Randolph Aff., Exhs. **N** (lease between plaintiff and ABDJ)) and **O** (Guaranty). Wilkinson is the principal owner of ABDJ and Dandar. Wilkinson Dep. at 11-14, 29. At the signing of the lease and guaranty, Morris knew Dandar was misidentified. See Randolph Aff., Exh. **P** (Deposition of Andre' Johnson sworn to on May 20, 2005 ("Johnson Dep.")) at 109-112, 132-133. Morris and Wilkinson discussed the misidentification, but Morris said he would make correction later. Id.

On the guaranty, Dandar agreed to be responsible for certain obligations in the event of a default by ABDJ. Randolph Aff., Exh. **O** (Guaranty). Dandar's tax identification number was included on the guaranty under the signature of its authorized agent. Wilkinson Dep. at 113-

-12-

115, 156-157.   Dandar paid $12,447.78 as security deposit.
See Daniel Wilkinson Declaration dated July 18, 2005 (check
from Dandar to Cap Centre dated June 6, 2003).   Nowhere in
the lease or guaranty did Wilkinson sign in his individual
capacity.   Further, Wilkinson did not agree to be personally
liable for any of ABDJ or Dandar's obligations.   See Randolph
Aff., Exhs. **N** and **O**.

In July 2003, the Redskins traded Wilkinson to the
Detroit Lions.   Wilkinson spoke to David Cordish, requesting
termination of the lease on behalf of ABDJ.   Wilkinson Dep.
at 179-180.   On August 11, 2003, Cap Centre sent a notice of
default to ABDJ.   See Randolph Aff., Exh. **Q** (Letter from
Cordish & Cordish to A Big Daddy Joint LLC re Notice of
Default dated August 11, 2004).   In an internal memorandum,
Cap Centre established February 9, 2004 as the rent
commencement date.   See Randolph Aff., Exh. **R** (Cap Centre's
internal memorandum dated September 24, 2003).   In February
2004, plaintiff commenced this litigation against Wilkinson
in his individual capacity.

**ARGUMENT**

**POINT I**

**STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate when no material facts are in dispute.  Federal Rules of Civil Procedure 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Bland v. Norfolk & Southern R.R. Co</u>., 406 F.2d 863, 866 (4th Cir. 1969).  The question of whether a cause of action exists may be decided by summary judgment.  <u>Silver Hill Station Ltd. Partnership, v. HAS/Wexford BancGroup, LLC</u>, 158 F. Supp. 2d 631 (D.Md. 2001).  "When the facts controlling the application of a rule of law are undisputed, the application raises a question of law for the court which the court may decide on a motion for summary judgment."  <u>Silver Hill Station Ltd.</u>, 158 F. Supp. 2d at 637, *quoting* <u>Trevino v. Yamaha Motor Corp</u>., 882 F.2d 182, 184 (5th Cir. 1982).

**A.   Cap Centre Motion For Summary Judgment For Breach Of Its Contract Claim Should Be Denied**

In its complaint, Cap Centre alleges ABDJ failed to provide timely plans as required by section 1401 of the lease.  Complaint ¶¶8, 11.  Cap Centre, in its motion for summary judgment, contends ABDJ breached the lease by failing to provide "Tenant Plans" for the construction of a restaurant.  Cap Centre Memo. at 15.  Next, Cap Centre makes an improbable leap in legal analysis by stating,

-14-

> Wilkinson executed the Guaranty as the purported agent of a nonexistent or fictitious principal at the time of contracting, [therefore,] Wilkinson is . . . personally liable on that Guaranty.

Cap Centre Memo. at 16.

Cap Centre is wrong and its argument is merely a veiled attempt to maintain a frivolous claim against Wilkinson. It is plain that to maintain a cause of action for breach of contract against Wilkinson, Cap Centre and Wilkinson must be in privity of contract. Carson v. Giant Food, Inc. 187 F. Supp. 2d 462 (Md. 2002); Copies Typewriters Calculators, Inc. v. Toshiba Corp., 576 F. Supp. 312, 322 (D.Md. 1983). See generally Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. Partnership, 372 Md. 763 (Md. 2003). They are not. Wilkinson is not the tenant on the lease and he is not the guarantor under the guaranty.

Moreover, contrary to Cap Centre's assertion, at no time did Wilkinson act on behalf of a non-existent company. Rather, Dandar existed at the time and still exists. It is undisputed that (1) Wilkinson informed Morris the guarantor would be Dandar Enterprises, Inc., see Wilkinson Dep. at 113-115; (2) Wilkinson provided Dandar's tax identification number on the guaranty, see Wilkinson Dep. at 115-116 and guaranty (Exh. O); (3) Wilkinson tendered a $12,447.78 check as security deposit on the lease drawn on Dandar's bank account, see Wilkinson Declaration and (4) Morris was

informed Dandar was misidentified on the guaranty, see Johnson Dep. at 109-112, 132-133. Wilkinson provided Cap Centre with sufficient information to verify or conduct due diligence concerning the guarantor. Consequently, the lack of privity of contract and Cap Centre's failure to move on its negligent misrepresentation claim, mandates denial of Cap Centre's summary judgment motion on count 1 of its complaint.

## B.   Cap Centre's Motion For Summary Judgment On Wilkinson's Negligent Misrepresentation Claim Should Be Denied

Cap Centre makes three arguments in support of its efforts to defeat Wilkinson's counterclaim for negligent misrepresentation.

### 1.   Wilkinson Has Made A Claim for Negligent Misrepresentation

Cap Centre contends its misrepresentations are not actionable because they were merely promises or predictions of future events. In support of that specious argument, Cap Centre cites Sass v. Andrew, 152 Md. App. 406, 832 A.2d 247 (2003) -- a fraud case. Sass is inapposite because this action involves negligent misrepresentation, not fraud. In his deposition, Wilkinson testified,

> Mr. Kerr: Do you recall discussing with Long at this time period, mid May, an instruction to her that your were only prepared to proceed if the restaurant was part of a package with the hotel?
>
> Mr. Wilkinson: I remember having some type of discussion with Sandra Long that the hotel was our priority and that we have a strong interest in the

restaurant, but our reason for being at the Capital Centre was for the hotel.

   *      *      *      *      *      *

Mr. Kerr: Do you remember her giving you any feedback? Did she tell you what the status was of the hotel as part of the restaurant negotiations?

Mr. Wilkinson: Well, it was apparent that the hotel talks had become – started to become a little shaky. We were hearing different stories regarding the hotel and our first right of refusal to it if you say.

Mr. Kerr: Any recollection of where the stories were coming from?

Mr. Wilkinson: I think it was just a lot of mixed conversations that we were hearing from Mike Morris.

Mr. Kerr: Okay, Any more details, that you can remember what Mr. Morris would have told you or what Ms. Long told you Morris said?

Mr. Wilkinson: Other than that we had found out at one point in time that there was another group who had signed a letter of intent for the hotel site along with us.

   *      *      *      *      *      *

Mr. Kerr: What was your reaction when you learned that?

Mr. Wilkinson: That we were being basically played with as far as the hotel project and that they were never serious about it and it was only the restaurant that they were serious about.

See Wilkinson Dep. 107-112.

With respect to a Letter of Intent concerning the hotel, Wilkinson testified,

Mr. Kerr: But you recall that a letter of intent was issued by Capital Centre to you with regard to your intentions to build and operate a hotel on the Capital Centre site.

Mr. Wilkinson: Yes, And then things were – from Cordish's side shifted towards the restaurant, and that was pretty much used as a leveraging tool over the hotel.

    \*       \*       \*       \*       \*       \*

Mr. Kerr: Is it your position that your signing of the restaurant lease on behalf of A Big Daddy Joint, LLC was conditioned upon, was subject to an agreement on the hotel?

Mr. Wilkinson: The restaurant was always used as a dangling tool, if you say, as far as whether they will allow us to move forward with the hotel based on the restaurant.

    \*       \*       \*       \*       \*       \*

Mr. Kerr: Tell me though, what's the nature of the promise?  What is it you were promised?

Mr. Wilkinson: That we would have first right of refusal on the hotel and that in fact we would move forward on it.

A letter of intent, to the best of my recollection, was prepared and was put on the back burner because of the restaurant.

See Wilkinson Dep. at 201-208.

Further, misrepresentations were made with respect to the Arena Drive exit, Wilkinson testified,

Mr. Kerr: .  .  . Cordish officials represented to defendant, meaning you, that the Arena Drive exit from Interstate 495 on the Capital Beltway soon would be open to all vehicular traffic.

    \*       \*       \*       \*       \*       \*

Mr. Wilkinson: During the – again, I can't tell which one said it first, but it was during the time we were looking at the aerial architectural renderings that they had in their conference room.

Mr. Kerr: Are you alleging that Mr. Morris or Reed Cordish made such a representation to you?

Mr. Wilkinson: What representation?

Mr. Kerr: That there would be a higher revenue produced because of the high volume of traffic entering Capital Centre from Interstate 495?

Mr. Wilkinson: Yes.

See Wilkinson Dep. at 215-220.

## 2.   Cap Centre Alleges It Owed No Duty to Wilkinson

Cap Centre argues Wilkinson's negligent misrepresentation claim should be dismissed because Cap Centre owed no duty to Wilkinson, because Wilkinson is only seeking money damages and because the lease with ABDJ contains a disclaimer.  Cap Centre Memo. at 22-23.

With respect to the "no duty" and economic loss assertion, if the Court agrees with Cap Centre, the Court must also enter judgment in favor of Wilkinson on his motion for summary judgment as to counts one and two of Cap Centre's complaint.  This is so given that Wilkinson owed no tort or fiduciary duty to Cap Centre and given that Cap Centre can only maintain the breach of contract if it prevails on the negligent misrepresentation count.  See Discussions in Point II of this memorandum.

As to the disclaimer argument, it fails because Wilkinson, in his individual capacity, is not a party to the lease and is not bound by those disclaimers.  Cap Centre and ABDJ are the entities subject to the disclaimers in the lease, not Wilkinson.

## 3.   Cap Centre Alleges Wilkinson Has No Standing

Using derivative action cases as a backdrop, Cap Centre avers Wilkinson has no standing to sue.  Cap Centre is disingenuous because it knows Wilkinson has brought this

action in his individual capacity, not on behalf of ABDJ or Dandar.

Wilkinson contacted David Cordish about constructing and operating a hotel at the Capital Centre. Cordish and Morris misrepresented to Wilkinson that he would have the first right of refusal on the hotel. However, Cordish gave the first option to Red Rock Global. Wilkinson Dep. at 110-111. Further, Wilkinson negotiated a letter of intent in his individual capacity concerning the hotel (see Randolph Aff., Exhs. **F** and **H**) Wilkinson signed a confidentiality agreement and Wilkinson provided his financial statement to Cap Centre solely in connection with the hotel. Wilkinson Dep. at 81, 85-89. Cap Centre has not provided information to refute this evidence.

## C.   Wilkinson Is Entitled To A Jury Trial

On two occasions, this Court has denied Cap Centre's motion to strike Wilkinson's jury demand. Without any additional basis for doing so, Cap Centre makes the same motion for a third time. Cap Centre has neither pointed to any additional facts nor has it cited any authority, which would deny a jury trial to a non-party to a contract in similar circumstances.

Further, Cap Centre has the burden of proof on the question whether Wilkinson in his individual capacity has waived his right to a jury trial. See Memorandum and Order

dated February 11, 2005 (Paper No. 42) at 4.   Here, the waivers pointed to by Cap Centre do not bind Wilkinson in his individual capacity because he is not a party to either the lease or guaranty.   Wilkinson signed both documents as authorized agent.   <u>Hulsey v. West</u>, 966 F.2d 579 (10th Cir. 1992).   As in <u>Hulsey</u>, only ABDJ and Dandar waived their right to a jury trial, not Wilkinson, individually.

As this Court noted in its Memorandum and Order dated February 11, 2005, "Wilkinson contends that there was a corporate entity which entered into a contract with Capital Centre." Memorandum and Order (Paper No. 42) at 3.   From the outset, Wilkinson has maintained that Dandar Enterprises, Inc. is the proper guarantor.[3]   Even though Dandar was misidentified as a limited liability company (as opposed to a for profit company) on the guaranty, (1) Wilkinson informed Morris the guarantor would be Dandar Enterprises, Inc., see Wilkinson Dep. at 113-115; (2) Wilkinson provided Dandar's tax identification number on the guaranty, see Wilkinson Dep. at 115-116 and guaranty (Exh. O); (3) Wilkinson tendered a $12,447.78 check as security deposition on the lease drawn on Dandar's bank account, see Wilkinson Declaration and (4) Morris was informed Dandar was misidentified on the guaranty,

---

[3]      Wilkinson has four companies, which have Dandar Enterprises as a part of their names.   <u>See</u> footnote 2 above.

see Johnson Dep. at 109-112, 132-133.  Accordingly, Wilkinson is entitled to a jury trial.

## D.  Other Issues Raised by Cap Centre

Cap Centre seeks judgment on Wilkinson's affirmative defenses – estoppel and waiver.  Cap Centre provides no evidence in support of its motion.  In Maryland, questions of waiver and estoppel are factual to be decided by the trier of fact.  Allstate Ins. Co. v. Reliance Ins. Co., 786 A.2d 27 (Md.App. 2001); Bean v. Steuart Petroleum Co., 224 A.2d 295 (Md. 1966).

Likewise, Cap Centre's argument concerning punitive damages and attorney's fees cannot be resolved by summary judgment, but must await trial.

## POINT II

## E.  Wilkinson Is Entitled To Summary Judgment On Plaintiff's Breach of Contract Claim

A Big Daddy Joint, LLC entered into a lease with Cap Centre to lease a restaurant/sports bar.  Randolph Aff., Exh. **N**.  Dandar guaranteed ABDJ's performance under the lease.  Randolph Aff., Exh. **O**.  Wilkinson, individually, is not a party to the lease or guaranty.

To be liable for breach of contract, Wilkinson must be in privity of contract with Cap Centre.  He is not. Carson v. Giant Food, Inc. 187 F. Supp. 2d 462 (Md. 2002); Copies Typewriters Calculators, Inc. v. Toshiba Corp., 576 F.

Supp. 312, 322 (D.Md. 1983).   See generally Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. Partnership, 372 Md. 763 (Md. 2003).   Wilkinson is not a party to the lease or guaranty; therefore, Cap Centre has no claim for breach of contract against Wilkinson.

## F.   Wilkinson Is Entitled To Summary Judgment On Plaintiff's Negligent Misrepresentation Claim

Causes of action based on negligent misrepresentation require that the party being sued owes a duty in tort to the party bringing the suit.   Parker v. Columbia Bank, 91 Md. App. 346, 604 A.2d 521 (Md. 1992); Silver Hill Station LP, 158 F. Supp. 2d at 635.   A contractual obligation, by itself, does not create a tort duty.   Jones v. Hyatt Ins. Agency, Inc., 741 A.2d 1099 (Md. 1999), quoting Mesmer v. M.A.I.F., 725 A.2d 1053, 1058 (Md. 1999).

The elements of negligent misrepresentation under Maryland law include:

> (1)   the defendant misrepresented a present or past material fact;
>
> (2)   the defendant, owing the plaintiff a duty of care, was negligent in making the misrepresentation;
>
> (3)   the defendant made the misrepresentation intending that the plaintiff would act in reliance on it;
>
> (4)   the defendant knew the plaintiff probably would rely on the misrepresentation, which if false would cause injury or loss to the plaintiff;

-23-

(5)   the plaintiff relied on the misrepresentation;

(6)   the plaintiff's reliance was justified; and

(7)   the plaintiff suffered damages as a result of the plaintiff's reliance on the misrepresentation.

The second element has two parts: (i) defendant must owe a duty of care to plaintiff and (ii) defendant must negligently assert a false statement.   <u>Parker</u>, 91 Md.App. at 356, 604 A.2d at 530.

On two occasions, the United States District Court for the District of Maryland granted defendants' motion for summary judgment on negligent misrepresentation claims. <u>Silver Hill Station Ltd. Partnership, v. HAS/Wexford Bancgroup, LLC</u>, 158 F. Supp. 2d 631 (Md. 2001); <u>G&M Oil Co. v. Glenfeld Fin. Corp</u>., 782 F. Supp. 1078 (D.Md. 1989).

In <u>G&M Oil Co. v. Glenfed Fin. Corp</u>., 782 F. Supp. 1078 (D.Md. 1989) a borrower filed suit against a lender asserting many claims, including negligent misrepresentation in connection with a failed loan.   In analyzing the borrower's claim, Judge Ramsey noted "Maryland courts have adopted the view that in order for a duty of care to exist between parties involved in an arm's length commercial transaction involving pecuniary loss only, the parties must have a special relationship or intimate nexus." 782 F. Supp. at 1089.   Looking at the parties (who were represented by counsel), Judge Ramsey found no special relationship or intimate nexus between the parties.   Judge Ramsey concluded

"before the Court is a financing deal gone awry between two businesses, bargaining at arm's length with their eyes open; no special duty can be imposed on either party in such a circumstance."   782 F. Supp. at 1089.   Judge Ramsey further noted, a party to an arm's length commercial transaction only has the right to rely on the other party for information if a duty exists to provide accurate information.   No duty existed in G&M Oil, accordingly, Judge Ramsey granted summary judgment for the lender.

In Silver Hill Station, a borrower applied for a commercial loan to refinance a mortgage on a shopping center. Several months after receiving the loan application, fee and deposit, the lender's broker allegedly verbally informed borrower that the loan application had been approved and that a formal commitment letter was forthcoming.   However, a short time later, the lender sent a written "preliminary commitment letter" contingent on several matters, including an environmental analysis.   Borrower filed suit for negligence and negligent misrepresentation alleging that the lender was negligent in processing the application and that the lender's broker made negligent misrepresentations concerning the status of the loan.   The lender moved for summary judgment.

Judge Messitte granted the motion for summary judgment on both counts.   With respect to the negligent misrepresentation claim, Judge Messitte stated,

As with ordinary negligence, negligent misrepresentation in the context of a failed loan transaction presupposes the existence of a duty on the part of the lender. See Parker, 91 Md. App. 346, 604 A.2d 521. While in the negligence context the duty is cast as one in tort after the fashion of Jacques, in negligent misrepresentation context it is fiduciary in nature. Id.

But as the Court has already observed, for a tort duty to come into play, extraordinary circumstances above and beyond contractual privity are required. For a fiduciary duty to exist, 'special circumstances over and above any contractual obligations' must exist. Id. at 369, 604 A.2d at 532. Among those special circumstances, as established by Parker, are (1) assumption by the lender of extra services over and above the contractual obligation and (2) receipt by the lender of economic benefits other than those accruing to the ordinary mortgage.

. . . Circumstances above and beyond contractual privity must be present before any duty comes into play.

Silver Hill Station, 158 F. Supp. at 640-41.

In analyzing the facts, Judge Messitte found the borrower owed no fiduciary duty to lender for purposes of a negligent misrepresentation cause of action. The Court stated, the borrower's officials acknowledged the lender assumed no services other than the "normal investigations, evaluations and inspections that a prudent lender" would make. Likewise, Judge Messitte found the lender did not benefit beyond the mortgage itself.

The principles pronounced in G&M Oil and Silver Hill involving lenders and borrowers are applicable to a commercial transaction between landlords and tenants. See generally Parker v. Columbia Bank (residential loan) and Weisman v. Connors, 312 Md. 428, 540 A.2d 783 (Md. 1988) (employment contract).

The instant case involves money damages only and no special relationship or intimate nexus exists between the parties. Furthermore, no special circumstances over and above the contractual relationship between Cap Centre and ABDJ exists here. Cap Centre assumed no extra services. Cap Centre did not even incur any costs building out the premises because the transaction was merely a ground lease between Cap Centre and ABDJ.

Cap Centre is controlled by sophisticated businessmen (Messrs. Abe Pollin and David Cordish). See Recognition Agreement, annexed to Complaint as Exhibit J. Cap Centre negotiated an arm's length commercial lease with ABDJ, with a guaranty by Dandar. During the entire transaction, Cap Centre was represented by in-house counsel and by Morris, who has broad commercial real estate experience. ABDJ and Dandar were represented by counsel. Wilkinson has no direct contract with Cap Centre. Under these circumstances, as a matter of law, Wilkinson, individually, owed no duty to Cap Centre.

Cap Centre contends,

> Capital Centre agreed to accept the guaranty of Dandar Enterprises LLC in lieu of the guaranty of Wilkinson and his wife in reliance upon Wilkinson's express representation that Dandar Enterprises LLC was a limited liability company which held ownership of substantial assets. These representations made by Defendant Wilkinson were false, and Wilkinson made these false representations negligently without making reasonable efforts to determine if an entity known as Dandar Enterprises LLC, actually existed or held title to substantial assets. In fact, there was not then nor is there now, an entity known as Dandar Enterprises LLC, registered or qualified to do business in Maryland, or, so far as Capital Centre can determine, anywhere.

Complaint ¶14.

Cap Centre's contention is disingenuous and is nothing more than an assertion that Wilkinson failed to use reasonable care in articulating the name of the guarantor or in pointing out that the guarantor's corporate designation had been incorrectly typed on the guaranty.[4]

Simple due diligence by Cap Centre would have detected the misnomer regarding Dandar's corporate name/status (i.e., "Inc." versus "LLC"). Cap Centre had the ability to correct the misnomer by simply requiring a tenant application or obtaining a credit check – procedures any

---

[4] During his deposition, Wilkinson testified, "Again, this must be a clerical mistake that was simply overlooked, because I have several Dandar Enterprises companies." He further said, "I believe there was a mistake created somewhere, and I believe that a sufficient tax ID number that was given would have cleared that up." Wilkinson Dep. at 142, 144. Also,

prudent landlord in a commercial transaction would undertake.

Cap Centre did neither.  Morris Dep. at 127-129.  <u>See also</u>

Wilkinson Dep. at 165.

During his deposition, Morris was asked whether

prospective tenants were required to complete an application.

Morris Dep. at 25-30.  Morris testified,

> Mr. Morris:    It depends on the tenant.
>
> Mr. Solomon:   And what is the criteria that you would
> use to determine whether or not you would require a
> tenant application?
>
> Mr. Morris:    There is no criteria.
>
>     *       *       *       *       *       *
>
> Mr. Solomon:   And out of the 50 leases, do you recall
> how many tenants filled out a credit application?
>
> Mr. Morris:    I do not.
>
> Mr. Solomon:   Do you recall whether any of them filled
> out a credit application?
>
> Mr. Morris:    There were some.
>
>     *       *       *       *       *       *
>
> Mr. Solomon:   How would you as a leasing agent
> determine whether or not a person was suitable to
> lease space at the Boulevard at the Cap Centre?
>
> Mr. Morris:    There are a number of criteria.
>
> Mr. Solomon:    And what are those criteria?
>
> Mr. Morris:    Prior experience, finance ability, use,
> support from the county, desire to have that type
> of tenant in our project, desire from the county's
> perspective to have that type of tenant in the
> county, just to name a few.
>
>     *       *       *       *       *       *
>
> Mr. Solomon:   And you mentioned financial ability or
> suitability.  What do you mean by that?

---

Wilkinson testified he provided Dandar Enterprises, Inc.'s name to Morris,
who prepared the guaranty.  <u>Id.</u> at 113-115.

> Mr. Morris:   Whether we felt the tenant could be
> financially responsible as a tenant.
>
> *       *       *       *       *       *
>
> Mr. Solomon:   And what were those ways.
>
> Mr. Morris:   Sometimes it was through credit
> applications, sometimes it was through
> recommendations from other tenants and/or other
> respected acquaintances, friends, people
> responsible that we trusted, and sometimes it just
> came of the relationship that we had with certain
> tenants.
>
> *       *       *       *       *       *
>
> We only did credit applications where we felt that
> we couldn't trust the applicant in what they were
> presenting to us as their financial responsibility.
>
> Mr. Solomon:   Out of the 50 leases that you mentioned
> earlier, did you generally request financial
> information from the prospective tenants?
>
> *       *       *       *       *       *
>
> Mr. Morris:   Generally not. We trusted our tenants.

Morris Dep. at 24-30.

When asked how did Cap Centre determine creditworthiness, Morris stated, "Trust and representation by the tenant of what their net worth and current liabilities and current assets were.  To the extent that it seemed within reason, we trusted them.  In the sense it didn't, we would do other checks."  Morris Dep. at 83-84.

When Wilkinson signed the lease and guaranty, he did so as authorized agent of ABDJ and Dandar.  Wilkinson provided Dandar's tax identification number (31-1531279) and presented a check for $12,447.78 drawn on Dandar's bank account.  Rather than misleading Cap Centre, Wilkinson identified the tenant and guarantor, and provided Cap Centre

-30-

with Dandar's tax identification number and bank account.  As the Court of Special Appeals of Maryland stated in Parker, Cap Centre could not "abandon all caution and responsibility for [its] own protection and unilaterally impose a fiduciary relationship on another without a *conscious assumption* of such duties by the one sought to be held to be liable as a fiduciary."  Parker, 91 Md.App. at 357, 604 A.2d at 530.

Instead of requesting even the most rudimentary information about Dandar,[5] Cap Centre merely transferred information concerning Wilkinson from the Hotel LOI into the Restaurant LOI in order to prepare the lease and guaranty. Morris Dep. at 98.  It is important to note that Cap Centre (not Wilkinson) prepared and made all revisions to the LOIs, lease and guaranty.  Morris Dep. at 127.

Cap Centre cannot reasonably maintain that Wilkinson made a false statement when he provided Dandar's correct tax identification number and when Wilkinson presented a $12,444.78 check as security deposit drawn on Dandar's bank account.  Also, during his deposition, Morris acknowledged the "LLC" designation was included almost as an afterthought. See Morris Dep. 100 - 102, 113, 127 - 130.  The questions and answers on that point went like this:

---

[5]     Cap Centre did not request any information concerning Dandar. Wilkinson Dep. at 89.

Mr. Solomon:   Do you recall having any discussion with Ms. Long that the guarantor for the hotel project would be Dandar.

Mr. Morris:   My recollection of this was that at this conversation, they raised the issue of signing, Mr. Wilkinson signing anything personally, at which point we then discussed alternatives, which I presented I think a couple of different options.

One of the options that came up was what Mr. Wilkinson represented as his parent company, a company to which everything he had done had been owned by.

\*          \*          \*          \*          \*          \*

Mr. Solomon:   And the Dandar that you had a conversation about with Mr. Wilkinson and Sandra Long is Dandar Enterprises?

Mr. Morris:   I am fairly certain at this point in the discussions, he represented that the parent company holding all of the assets and presented them to me being – he being the singular owner and, therefore, basically identical to his assets was Dandar.   And he represented them at this point only as Dandar Enterprises.

Mr. Solomon:   You said at this point in time, on or about April 22, 2003, there wasn't a distinction between Dandar Enterprises, Inc. and Dandar Enterprises LLC?

Mr. Morris:   Correct.

\*          \*          \*          \*          \*          \*

Mr. Solomon:   Now, on or about April 28, 2003, do you recall having a conversation with Mr. Wilkinson about him personally guaranteeing the obligation of the tenant for the restaurant at the Boulevard at the Cap Centre?

Mr. Morris:   I know we discussed it.   I don't remember the exact date.   And I know we discussed it in conjunction with the same discussions regarding the guarantor for the hotel.

\*          \*          \*          \*          \*          \*

Mr. Solomon:   Were you still engaged in some generic discussion about Dandar Enterprises at the time of this version of the letter of intent?

Mr. Morris:   Could you be more specific about what you mean?

Mr. Solomon:   Well, you prepared or it was prepared at your direction, Exhibit 21, correct?

Mr. Morris:     Correct.

Mr. Solomon:   And with respect to the guarantor, you have identified Dandar Enterprises.

At the juncture that this document was prepared, did you have any information about Dandar Enterprises, Inc. versus Dandar Enterprises LLC?

Mr. Morris:   No, I was only made aware of Dandar Enterprises being Mr. Wilkinson's entity that he solely had ownership to.

Mr. Solomon:   And with respect to Dandar Enterprises, did you request any information from Mr. Wilkinson that would allow you to do a credit verification?

Mr. Morris:     I don't recall.

Mr. Solomon:   Do you recall receiving any financial information or tax returns with respect to Dandar Enterprises?

Mr. Morris:     I don't believe I recall.

Mr. Solomon:   Do you recall requesting such information from Mr. Wilkinson?

Mr. Morris:     I don't recall.

Mr. Solomon:   Mr. Morris, I show you what has been marked as Morris Exhibit Number 22 and ask you have you seen that document before.

Mr. Morris:     Yes.

Mr. Solomon:   Now, on the first page, item number 2, guarantor, is a handwritten note inserting LLC.  Do you see that?

Mr. Morris:     Yes.

Mr. Solomon:   Do you know why LLC was inserted there after the name Dandar Enterprises?

Mr. Morris:   I believe this was the last rendition of the proposal for the restaurant prior to a lease being written, to which at some point prior to the lease being written, it came to my attention that the guarantor entity was not defined by its corporate status, to which I then called Mr. Wilkinson, which I believe Ms. Long was on the phone, and requested whether or not the entity was, in fact, a corporation, an LP, and LLC.  And Mr. Wilkinson stated that it was an LLC.

Morris Dep. at 130.

Even when viewing this case in light most favorable to Cap Centre, summary judgment must be granted to Wilkinson, because no reasonable jury could find that Wilkinson made a false statement to Cap Centre concerning Dandar or that Wilkinson owed a tort or fiduciary duty to Cap Centre.[6]

## CONCLUSION

For the foregoing reasons, Cap Centre's motion for summary judgment should be DENIED:

1. as to count 1 (breach of contract) of Cap Centre's complaint, and

2. as to Wilkinson's counterclaim for negligent misrepresentation.

Further, Wilkinson's motion for summary judgment should be GRANTED:

3. as to count 1 (breach of contract) of Cap Centre's complaint, and

4. as to count 2 (negligent misrepresentation) of Cap Centre's complaint.

---

[6]     Furthermore, to allow Cap Centre's claims to go to trial would be a monumental waste of judicial time because Cap Centre cannot prove any damages.  Cap Centre has computed its damages at $363,899.48.  See Randolph Aff., Exh. **S** (Deposition of Darrell Nevin sworn to on March 9, 2005 ("Nevin Dep.") at 126-136, along with Cap Centre's revised damages calculation.  Even though ABDJ's lease was for 66 years; Cap Centre's mitigation analysis/calculation covered only 10 years.  Spreading the mitigation analysis over 66 years (as opposed to 10 years) and using all of Cap Centre's assumptions prove that Cap Centre has not suffered any loss but it has realized a benefit/profit of $9,081,284.33 over the 66 year lease.  See Randolph Aff., Exh. **T** (Explanation of Mitigation Analysis prepared by Darrel Nevin).  This is so because ABDJ's lease was a ground lease at $13.50 per square feet, whereas the replacement tenants included build out costs of $95.75 per square feet.  Exh. **S**.  Cap Centre has not presented any evidence to refute this conclusion.

Finally, Wilkinson requests such other relief as the Court may deem appropriate.

Dated:   July 18, 2005
         Greenbelt, MD

                    SOLOMON LAW GROUP, P.C.


               By: _____
                        Marcell Solomon (#22257)
                        Christopher S. Randolph (#15707)

                    7500 Greenway Center Drive
                    Suite 1130
                    Greenbelt, Maryland  20770

                    Attorneys for Defendant
                      *Daniel R. Wilkinson, Sr.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of July 2005, a copy of the foregoing DEFENDANT COUNTER-PLAINTIFF DANIEL WILKINSON'S MEMORANDUM OF LAW IN OPPOSITION TO CAP CENTRE'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS CROSS MOTION FOR SUMMARY JUDGMENT was served on counsel in this action by depositing a true copy of same, enclosed in a postpaid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service as follows:

               Charles M. Kerr, Esq.
               Kerr McDonald, LLP
               31 Light Street
               Suite 400
               Baltimore, MD 21202


               _____
                    Marcell Solomon